427 F.Supp. 806 (1977)
Alice M. WINDOM, Plaintiff,
v.
CITY OF ST. LOUIS et al., Defendants.
No. 75-966C(4).
United States District Court, E. D. Missouri, E. D.
February 24, 1977.
*807 Gilden & Dodson, St. Louis, Mo., for plaintiff.
James J. Gallagher, Associate City Counselor, St. Louis, Mo., for defendants.

MEMORANDUM
NANGLE, District Judge.
Plaintiff Alice M. Windom brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and 28 U.S.C. §§ 1331, 1343, alleging discrimination on account of sex, denial of free speech, denial of her right to petition the government for a redress of grievances, deprivation of life, liberty and property without due process of law, and denial of equal protection.
The case was tried before the Court without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties, and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure:

FINDINGS OF FACT
Plaintiff Alice M. Windom is a female citizen of the United States and a resident of the state of Missouri. Defendant City of St. Louis is a government and political subdivision, and is an employer within the meaning of 42 U.S.C. § 2000e(a) and (b). Defendant Edward F. Tripp is Director of the Department of Welfare for the City of St. Louis. Defendant Jefferson Tallent was at the times in question Commissioner of the Division of Adult Services of the City of St. Louis.
Plaintiff has a bachelor of arts degree in social welfare and a master of social work degree. She has worked for the Illinois Department of Mental Health; as a teacher and secretary in Ghana; for the United Nations in Ethiopia doing administrative and personnel work; and worked in Zambia in the Department of Social Welfare.
Plaintiff began working for defendant City on March 8, 1973 as a Social Worker II at the Medium Security Institution of the City of St. Louis ["MSI"]. Plaintiff supervised approximately six individuals who were case workers at MSI. Plaintiff was placed in a probationary period for six months, which is the normal practice under the Civil Service Rules of the City of St. Louis. Plaintiff was made a permanent employee, after she was rated by Lynman A. Stamps, Warden at MSI and plaintiff's immediate supervisor. It was unclear from the record whether plaintiff's status was made permanent on August 8, 1973, before the end of the six-month period, or September 8, 1973, as intended. The Department of Personnel apparently received the rating form on August 31, 1973.
From the outset of plaintiff's employment, plaintiff was embroiled in disputes with her superiors over her superiors' methods of handling work. On August 20, 1973, plaintiff, along with others sent a letter to defendant Tripp, concerning an incident between Warden Stamps and an Alderman. The employees were apparently upset because they felt that neither Mr. Tripp nor Mr. Tallent had sufficiently supported the Warden in this dispute. The letter stated that:
It appears that the Commissioner of Adult Services did not even avail himself *808 of the alternative of instructing the correctional officers involved in the original complaints not to take grievances to the press, but to use the appropriate channels.
On the same date, plaintiff along with other employees, sent a second letter to defendant Tripp indicating their growing concern "about the manner in which operations at the Medium Security Institution and the Municipal Jail are being planned since Mr. Jefferson Tallent was appointed Commissioner of Adult Services in May, 1973.". This letter criticized Mr. Tallent's handling of a grant application to the Missouri Law Enforcement Assistance Commission in that he had not provided any of the employees with a copy of the application. The signatories to the letter felt that they should have been involved in this planning of the grant and accordingly "[s]ince the matter was so important, we managed to secure copies of the "secret" document . . .". Numerous criticisms of the grant application were incorporated in the letter. These employees wanted information about the status of the grant, the amount of money available, how the money was to be distributed, how the granting authority functions, etc. The letter also commented ". . . that there seems to be a deliberate attempt by the Commissioner of Adult Services [Mr. Tallent] to undermine the positive potential of improvements in the delivery of divisional services to inmates of the Municipal Jail.". The letter concludes as follows:
Having made these very frank criticisms, we realize that cooperation between Mr. Tallent and the undersigned may henceforth be difficult. If we see a change in his attitude and a willingness to work with us as professional persons, fully competent in our respective fields and worthy of prior consultation on all matters affecting our work, we are sufficiently mature to work with him.
Plaintiff's concern about the grant did not end with this communication. On October 25, 1973, plaintiff sent a letter to Mr. Tallent requesting that certain matters be placed on the agenda for a forthcoming staff meeting. Among these items were the following:
(2) Recommendations to MLEAC concerning alterations in the grant proposal due to:
(a) Unrealistic and imprecise objectives arising from undefined terms and the Division's lack of control over external services required to meet some of the stated objectives.
(b) Elements in the reorganization plan which may be unfeasible.
(c) Possibly inadequate budgetary allocations, as in travel, conference registration fees.
(d) Dubious evaluation criteria.
In response, Mr. Tallent wrote a letter to plaintiff asking her to further define the general issues raised in her letter. The letter further noted:
The purpose of a general staff meeting is to discuss those concerns of a majority of the participants and to receive input from every member. It is my feeling that the Divisional Staff Meeting should not serve as a continuing forum for a few. I am well aware of the fact that you and perhaps a couple of other staff members are dissatisfied with the reorganization plan for the Division of Adult Services and the subsequent provision of the grant. I can appreciate your concern and certainly wish to give you ample opportunity to explicate those concerns to the fullest, but I suggest that a general staff meeting is hardly the place for that kind of dialogue.
I would think it more appropriate for you and those of your colleagues who share your concerns to schedule a meeting or series of meetings. . . . I think that such a session would have to begin with an essential ingredient  that of the assumption of the administration of confidence in the staff and a concomitant assumption of staff of confidence in the administration. I see that as the unresolved central issue in the conflict that seems to have developed between the administration and a few of the staff.
*809 On November 5, 1973, plaintiff sent a memorandum to Mr. Tallent after having studied the grant application. The memorandum consisted of six pages of questions "which might lead to the proposal of revisions to MLEAC if other staff members share my views". Among the questions are the following:
Does the administration of the Division of Adult Services have a policy on any of the following issues, which are just a few of the problems meriting consideration? If so, what steps are planned by the administration, or should be taken by personnel employed under the grant?
(a) Advocating the decriminalization of "victimless crimes", such as prostitution, masquerading, public drunkenness, etc.
(b) Advocating the legal supply of narcotics to addicts.
. . . . .
Since the grant application embraces a divisional reorganization and purports to describe "the problem" in St. Louis, I believe it is appropriate to raise these questions in this context. If, however, the administration conceives the Division as a passive receptacle for persons processed through the police and the courts, this should be stated.
. . . . .
How long a sentence will allow adequate time for resocialization?
Plaintiff, who had previously complained about employees not following a chain of command, contacted an official of MLEAC herself with her criticisms of the grant proposal. Mr. Tallent notified Warden Stamps of the same and asked for a report on the matter. Plaintiff wrote a letter to the Warden about the incident and stated:
I was very surprised to hear that employees of this Division are prohibited from contacting MLEAC, which is a public, tax-supported agency. I also could not understand why my contacting MLEAC should have upset the Commissioner  he states that he is the only official voice in the Division recognized by Region V, so the concerns I expressed must not have been recognized by Region V.
I have never seen or heard any instruction from the Commissioner, before the present letter, advising staff in general or myself in particular to refrain from contact with MLEAC. If the Commissioner takes any further action on this matter, I will be obliged to challenge him to prove that I violated an instruction and, secondly, to prove that he is making proper use of his authority when he instructs staff not to speak to employees of a public agency.
Mr. Tallent, after receiving a copy of the above letter, wrote to Warden Stamps, noting
Miss Windom, I think, has made valuable contribution to the efforts of the Division in her role as M.S.I. Supervisor of Social Services, but I am becoming disturbed about her seeming inability to recognize the fact that a professional difference in assessment is not a personal affront to her intelligence or dignity, and that she has an obligation to support Divisional policies in her role as a professional within the Division.
The evidence established that Mr. Tallent had only one week in which to prepare the grant application and that the money was urgently needed. At that time, funds were being borrowed from a construction grant to pay salaries. Mr. Tallent felt that there was no time for staff input. Plaintiff's evidence failed to establish that staff input was required, or was even normally sought during a grant application. Responsibility for the grant application lay with Mr. Tripp and Mr. Tallent. There is no indication in the record that any portion of the responsibility lay with plaintiff. The extensive flow of correspondence between the parties indicates that Mr. Tallent attempted to satisfy plaintiff's demands; however, time pressures required that his efforts be spent in a more fruitful manner than responding to a list of questions calling into question broad policy decisions.
During this same period of time, plaintiff and Mr. Tallent were involved in a dispute *810 over modes of address. When Mr. Tallent indicated that he wanted plaintiff to address him as Mr. Tallent in written correspondence, plaintiff insisted that Mr. Tallent refer to her as Miss Windom. When Mr. Tallent addressed plaintiff as Alice, plaintiff became angered and discussed the incident with lower level personnel. Mr. Tallent gave plaintiff a formal reprimand because:
A. You did rebuke the Commissioner of Adult Services in the presence of other MSI staff members;
B. Immediately afterwards you refused to discuss the incident with the Commissioner, even though he had requested such a conference.
Plaintiff sent Mr. Tallent a letter about the incident and stated in part:
When you tell me that I have no right to tell you how to address me, you remind me of the stereotyped white boss who insists on calling the black servant by his on her first name without consultation or even heed to the person's own wishes.
. . . . .
In so many words, you told me that it was your prerogative and your prerogative alone to determine the style of address between us. Is this because you are white and I am black? Because you are male and I am female?
In October, 1973 plaintiff applied for the position of Social Worker III. Two women social workers were the examiners for the position. Plaintiff did not receive the promotion and does not complain of this failure to promote herein. One of the examiners commented that plaintiff appeared to be interested only in having her own position reclassified and not in the position of Social Worker III.
Under the new grant application, a position of Correctional Manager was to be created. Plaintiff objected to the creation and necessity of such position. Nonetheless, she applied for this position on January 3, 1974. The competitive examination for this position consisted of an oral interview and rating. Defendants Tripp and Tallent were the two raters for the examination.
For any promotional position in the city system, two lists of eligibles are prepared: the promotional list and the open competitive list. The promotional list is composed of those persons who are already permanent employees of the City who desire promotion. The open competitive list consists of all other persons desiring the open job. The position to be filled is filled from the promotional list first. The evidence adduced at trial established that plaintiff was not placed on the promotional list but instead on the open competitive list. The person ultimately chosen to be Correctional Manager was the only person on the promotional list. Plaintiff has not objected herein to her placement on the open competitive, instead of the promotional, list, and the Court must presume that this placement was correct. Under these circumstances, it is clear that plaintiff could not have been promoted over the man ultimately selected, since the promotion was made from the promotional list first.
The oral interview, and the questions asked of plaintiff, were not validated in accordance with the guidelines of the Equal Employment Opportunity Commission. Plaintiff, however, made it clear during her interview that she did not want the position but wanted to make sure that the person who was selected was at least as well qualified as she was. Plaintiff was eliminated on her experience and training, according to the ratings of defendants Tallent and Tripp. The man ultimately chosen for the position was Carl Gilmore who had a bachelor of science degree and had worked for one year as a Social Worker I and for one year as a vocational education instructor for the defendant City. Gilmore was the only individual on the promotional list; while he was not rated the highest of all the applicants, his position as the only individual on the promotional list insured his selection.
Plaintiff filed a charge with the Equal Employment Opportunity Commission on March 18, 1974 alleging denial of her rights because of her sex. This charge was based on the failure of defendants to promote her to the position of Correctional Manager.
*811 On January 16, 1974, defendant Tallent wrote plaintiff a letter asking for changes in the MIS monthly report for social services and commenting:
In general I would say that this is a quite thorough report, but that there seemed to be a tendency in Sections VI, through XII, toward editorializing and subjective interpretation. While I certainly welcome this type of feedback, I would think that it could be forwarded to the administration via some format other than the monthly report . . .
Plaintiff responded with a three-page letter in which she stated:
I was disappointed and, frankly, shocked by this request.
. . . . .
If I only prepare a statistical report, I would not be adhering to my own professional standards. It might be possible for me to send you a statistical report and draft another for in-house staff, but this would be duplication and require considerably more time. What I can do, however, is to set out figures above the commentary, so that you can just glance at the numbers and not have to read the whole sentences to get the information which interests you.
Plaintiff additionally commented on the various changes which defendant Tallent had suggested. In response to this letter, Mr. Tallent wrote plaintiff yet another letter, again explaining what he wanted and why, and concluded by stating
I am sure that we both have too many demands on our time to involve ourselves in a flurry of written memos, rejoinders, rebuttals, etc.
On April 9, 1974, defendant Tallent notified plaintiff that she was to be temporarily transferred from MSI to the Municipal Jail effective April 15, 1974 to May 10, 1974. At that time, a suit was pending concerning conditions in the City Jail. Tyler v. Percich, No. 74-40C(2). The temporary transfer was so that plaintiff could recommend "a positive plan of action for the Jail social services unit" and to "make recommendations relative to the transfer of women prisoners from the Jail to M.S.I.". Plaintiff's duties were outlined in a letter to her and included the following:
You will be expected to spend at least one work week, eight hours per day, in the womens' housing unit to establish a "feel" for their attitudes, wants, desires, needs, etc.
In a letter sent the same date to Warden Stamps, defendant Tallent notified Stamps of this transfer. Plaintiff immediately protested this action, contending that the studies "would merit a team of researchers and a fee of several thousand dollars if handled by independent consultants. The intended economic exploitation of me is knowledge in the phrase `You will be . . . an in-house consultant'". Plaintiff contended that this transfer was in retaliation for the filing of Equal Employment Opportunity Commission charges about the promotion. Warden Stamps wrote a letter to Mr. Tallent stating that the transfer "would jeopardize the Social Services program at the Medium Security Institution" because of a lack of personnel at the time due to retirements and transfers. Mr. Tallent responded by stating that "my decision could be altered if Miss Windom's absence would cause an undue hardship on the social services operation at M.S.I.". Miss Windom directed a letter to the Civil Service Commission complaining about the transfer and asking them to answer the following questions:
(a) Are City employees subject to abrupt, involuntary temporary transfers? Does Mr. Tallent, as my Appointing Authority, have the right to transfer me temporarily to the Municipal Jail when I was employed at the Medium Security Institution? Both facilities are in the same Division.
(b) What are the limits of the "performs related work as assigned" clause in the Civil Service job specification?
On April 16, 1974, plaintiff wrote a letter to Mr. Tallent requesting a clarification of the study he wished her to perform. Additionally, she wanted a list of priorities and the *812 depth to which he wanted each item explored. She also added the following:
I am mystified by your instruction that I spend 40 hours in intensive observation of the women at the jail. Do you view these women as creatures from another planet? Or do you believe their "attitudes, wants, desires, needs, etc." are so bizarre that I, having been a grown woman for nearly two decades, would be unable to make a professional social worker's assessment in less than 40 hours? If this intensive observation is to prepare me to work with the women later, I must point out that none of the men hired as social workers (without social work training) have been instructed to spend 40 hours in male housing units. Is this another example of your propensity for sex discrimination? Please clarify.
On April 19, 1974, Mr. Tallent wrote plaintiff a letter referring to her letter of April 16, 1974. He viewed the letter as "tantamount to gross insubordination, and I refer specifically to your statement regarding my `propensity for sex discrimination'". This letter of April 19, 1974 informed plaintiff that she had been terminated, effective April 20, 1974, citing in support of that decision her negative and hostile attitude toward the Administration; her activities aimed at undermining the Administration; her inability of maintaining a harmonious and working relationship with her superiors and her failure to satisfactorily perform her job as a result.
Plaintiff filed charges with the Equal Employment Opportunity Commission on April 15, 1974, contending that her transfer to the City Jail was in retaliation for previous filings. On April 22, 1974, plaintiff filed another charge with the Equal Employment Opportunity Commission alleging dismissal in retaliation for the filing of charges.
The evidence established overwhelmingly that while plaintiff was highly educated and well-qualified for her position as Social Worker II, she was unable to fit herself into the structure of the city government. There were few decisions made by her supervisors which were not the subject of plaintiff's attack. This required her superiors to expend considerable time and effort in defense of their actions. Her supervisors were also conscientious and competent workers, all as well-intentioned as she in seeking mutual goals. Plaintiff, however, was unable to accept the directives of her supervisors.
The failure to promote plaintiff, the temporary transfer to the Municipal Jail, and plaintiff's discharge were not based in whole or in part upon her sex. The Court further finds that the transfer and the discharge were not effectuated in retaliation for the filing of charges with the Equal Employment Opportunity Commission.

CONCLUSIONS OF LAW
This Court has jurisdiction over the subject matter and the parties to this suit. 42 U.S.C. § 2000e et seq.; 28 U.S.C. §§ 1331 and 1343.
Plaintiff's first contention is that defendants' failure to promote her to the position of Correctional Manager constituted discrimination on account of sex. In McDonnell Douglas Corporation v. Green, 411 U.S. 792 at 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the elements required to establish a prima facie case of racial discrimination. These elements, held to be applicable to claims of sex discrimination in Holthaus v. Compton & Sons, Inc., 514 F.2d 651 (8th Cir. 1975), are as follows:
The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
*813 Once this prima facie case has been established, the employer carries the burden of articulating "some legitimate, nondiscriminatory reason for the employee's rejection," McDonnell Douglas Corporation, supra, 411 U.S. at 802, 93 S.Ct. at 1824, and the employee "must . . . be afforded a fair opportunity to show that . . . [the employer's] stated reason for . . . [the] rejection was in fact pretext.". Id. at 804, 93 S.Ct. at 1825.
The nature of the promotional process, dependent totally upon an interview based on subjective criteria, calls the selection procedure into question. Cf., Robinson v. Union Carbide Corporation, 538 F.2d 652, 662 (5th Cir. 1976); Rogers v. International Paper Company, 510 F.2d 1340 (8th Cir. 1975), vacated on other grounds, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); Muller v. United States Steel Corporation, 509 F.2d 923, 927 (10th Cir. 1975), cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); United States v. N. L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973).
The Court does not doubt that plaintiff possessed all of the necessary paper qualifications for the job. Nevertheless, the Court must conclude that defendants' failure to promote plaintiff was not the result of discrimination. It is the Court's opinion that it was not the promotion interview which barred plaintiff's promotion, nor did the testing procedure serve to mask prejudice on behalf of defendants. Plaintiff had strenuously objected to the creation of the position and had stated in her interview for the job that she was not interested in obtaining the position. This Court will not require an employer to promote an applicant to a position which the applicant clearly does not desire nor feels to be necessary simply because the applicant is qualified. See Leinster v. Engman, 8 EPD ¶ 9774 (D.D.C.1974) stating that an employer can consider an applicant's lack of enthusiasm about the job and deny the applicant the position on that basis. Defendants have come forward with a legitimate, nondiscriminatory reason for their failure to promote plaintiff. Plaintiff has failed, however, to establish that this reason was merely pretextual.
Plaintiff also contends that her transfer to the Municipal Jail was the result of discrimination on the basis of sex. The evidence simply fails to establish any basis for this assertion. The actions taken by her supervisor do not constitute sex discrimination simply because plaintiff continually labeled them as such. Cf., Donaldson v. Pillsbury Co., 406 F.Supp. 1210, 1213, 12 FEP cases 958, 960 (D.C.Minn.1976) (". . . plaintiff saw bogeymen where there were none and unjustifiably attached improper motives and racial and sexual overtones to many events and relationships during . . her employment . . .").
The evidence also fails to establish that plaintiff's transfer to the Municipal Jail was in retaliation for the filing of charges with the Equal Employment Opportunity Commission. The evidence establishes simply that after the filing of charges, plaintiff was temporarily transferred to the Municipal Jail to work on a special project necessitated by conditions at the Jail and the pendency of a lawsuit concerning the same. Absent a casual connection between the two events, this does not amount to retaliation.
Plaintiff's employment at MSI was characterized by a total inability to accept the directions of her supervisors. Plaintiff seemed to be incapable of working within the structure that existed at MSI.
This personality conflict generated antipathy and professional incompatibility which might have made it more difficult for the plaintiff to perform. But this certainly does not translate into discrimination. An employer is not required to like his employees.
. . . . .
. . . [Plaintiff] spent many court hours challenging IBM's work procedure, program administration, project structuring, and allocation of funds, in connection with every undertaking that was entrusted to him. He, in effect, disagreed with many of IBM's employment policies and *814 assignments. No matter how meritorious his view, it does not justify imputing discrimination to IBM's personnel. Bradington v. International Business Machines Corporation, 360 F.Supp. 845, 854 (D.C. Md.1973), aff'd 492 F.2d 1240 (4th Cir. 1974).
Plaintiff's discharge was not the result of sex discrimination, nor in retaliation for the filing of charges with the Equal Employment Opportunity Commission. The discharge resulted, instead, from plaintiff's inability to perform effectively within the MSI structure.
There is no support for plaintiff's claim that her transfer was a denial of free speech. The Court similarly concludes that plaintiff's discharge did not constitute a denial of free speech. Plaintiff contends that the letter which she wrote to Mr. Tallent accusing him of sex discrimination, constituted an exercise of her right of free speech and that her discharge cannot be based upon the same. Cf., Pred. v. Board of Public Instruction of Dade County, Florida, 415 F.2d 851 (5th Cir. 1969); Bertot v. School District No. 1, Albany County, Wyoming, 522 F.2d 1171 (10th Cir. 1975). The letter itself was not the cause of the discharge but instead constituted the "final straw" in a long line of continual attacks on the actions of plaintiff's supervisors. Viewed in this context, the discharge did not abridge plaintiff's right of free speech. Cf., Pickering v. Board of Education, 391 U.S. 563, 573 at footnote 5, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).
Judgment will be entered for defendants.