**Barry W. POWELL, Plaintiff,**

v.

**BOB DOWNES CHRYSLER–PLYMOUTH, INC.,**
**Defendant.**

No. 90–226 C (2).

United States District Court,
E.D. Missouri,
Eastern Division.

April 15, 1994.

See also, 763 F.Supp. 1023.

1342

Demester K. Holland, St. Louis, MO, for Barry W. Powell.

James N. Foster, Jr., Partner, John B. Renick, Associate, McMahon and Berger, St. Louis, MO, for Bob Downes Chrysler–Plymouth, Inc.

John P. Jacoby, John S. Sandberg, Sandberg and Phoenix, St. Louis, MO, for Group Health Plan, Inc.

## MEMORANDUM

FILIPPINE, Chief Judge.

This matter is before the Court for a decision on the merits of plaintiff Barry W. Powell's employment discrimination claim against defendant Bob Downes Chrysler–Plymouth, Inc. ("Bob Downes") after trial to the Court.[1] The parties have filed post-trial briefs and responses thereto. The Court adopts this memorandum opinion as its findings of facts and conclusions of law, pursuant to Federal Rule of Civil Procedure 52.

In Count I of the second amended complaint, plaintiff seeks monetary relief for defendant's alleged violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").[2] Specifically, plaintiff contends that in discharging plaintiff from his position as a car salesperson on April 26, 1989, defendant discriminated against plaintiff on the basis of his religion (Judaism). Defendant argues that the discharge was based upon legitimate, non-discriminatory reasons due to plaintiff's performance and conduct; and the discharge would have occurred regardless of plaintiff's

religion. The parties stipulated that (a) a total of $30,000.00 in backpay was owed plaintiff if liability was found against defendant and in favor of plaintiff; and (b) interest and attorney's fees need to be considered if defendant is found liable with respect to the sole remaining claim. The parties further agreed to resolve any question regarding attorney's fees after the Court determines the merits of the Title VII claim.

Mr. Robert Downes ("Robert") operated defendant Bob Downes car dealership in St. Charles, Missouri, from 1980 until June, 1992. He was the sole owner of the dealership although his wife, Kathy Downes ("Kathy"), may have co-signed the loan and contributed some of the cash needed to purchase the dealership.

Plaintiff Barry W. Powell was employed by defendant Bob Downes in March, 1988, to sell new and used cars. Plaintiff had been a car salesperson for more than ten years, at five car dealerships, before he began working for defendant. During his tenure at Bob Downes, plaintiff was one of the top salespersons. Robert discharged plaintiff on April 26, 1989.

During the period relevant to this case, the dealership had between thirty and thirty-five employees, including department managers for each of five departments. Three of the five departments were: administrative, new car sales, and used car sales. Robert Rich was manager of the new car sales department during plaintiff's tenure at the dealership;[3] Kathy was responsible for the administrative department; and other individuals managed the remaining departments. Each manager, including Kathy, reported to Robert and was responsible for the profits and

---

1. Plaintiff's claims against another defendant, Group Health Plan, Inc., as well as plaintiff's other claims against defendant Bob Downes, have been resolved and are no longer before the Court for resolution.

2. Plaintiff's request to amend this Count so as to pursue a Title VII claim under the statutory provisions in effect after enactment of the Civil Rights Act of 1991 was withdrawn by plaintiff. Therefore, this claim is pursued under the provisions of Title VII in effect prior to enactment of the Civil Rights Act of 1991.

3. For a three-month period during 1988, Rich was elevated to the position of general manager for the dealership and another individual was hired to be the new car sales manager. At the end of that period the arrangement was revised so that the general manager position was eliminated and Rich was returned to the new car sales manager position. That arrangement of the dealership is not pertinent to this decision and will not be addressed further.

losses of the relevant department. Hiring, firing, and scheduling of personnel for a particular department were the responsibility of the manager of that department, subject to Robert's final decisionmaking authority.

Robert and Kathy shared an office at the dealership, but did not discuss dealership operations and personnel matters except with respect to the administrative department. Opinions expressed or comments made by Kathy with respect to operations or personnel of other departments at the dealership were considered by Robert to the same extent as any other employee's commentary about operations and personnel outside of the employee's department. In making decisions regarding the operations of and personnel at the dealership, Robert relied on the department managers as well as his personal observations and experiences.

Kathy engaged in numerous conversations with personnel at the dealership. Some of these conversations included the exchange of jokes and commentary pertaining to the Jewish religion and those who follow that religion. From these exchanges, Kathy understood that Rich and plaintiff were Jewish. Robert, who did not participate in these exchanges, knew Rich was Jewish but did not know plaintiff was Jewish.[4]

As new car sales manager, Rich hired several car salespersons, including: plaintiff, Ken McArthy, Steven Comensky, Corbett Mark McNail, Bruce Baum, Stuart Ziglin, and Joe Avenoli.[5] Rich, plaintiff, Comensky, Baum, and Ziglin are Jewish. The record does not persuasively indicate that anyone else at the dealership during the relevant time period was Jewish.

High turnover in personnel at car dealerships is not unusual. During plaintiff's tenure, several employees left defendant. McArthy, Baum, and Ziglin left the dealership on their own accord. Robert terminated Rich just prior to plaintiff's discharge on April 26, 1989, reportedly due to Robert's perception that Rich had acted disloyally by not supporting Robert during and after a staff meeting that day. Additionally, Comensky was discharged several hours after plaintiff's discharge, due to Comensky's low sales record.

Some new car sales transactions include a "trade-in" where the customer trades in the customer's present vehicle for part of the actual price of the new vehicle. Appraisals[6] of trade-in vehicles are usually provided by the used car manager at a car dealership. If that manager is unavailable to appraise a vehicle, another dealership manager, for instance, a general manager or a new car sales manager, is usually authorized to appraise trade-in vehicles. The appraisal amount is generally the amount given as the trade-in value for the customer's vehicle.

4. An example of the relevant exchanges is references to the employees hired by Rich as "the Jewish connection." While Robert recalled Rich making references to his "boys," Robert did not recall any express references to the religious affiliation of such persons and not all of those hired by or working under Rich were of the Jewish faith. Additionally, nothing of record indicates which employees were part of "Rich's boys." In other words, did the references only refer to those hired by Rich or did the references refer to all new car salespersons managed by Rich? Under the circumstances, the Court is unable to find Robert should have known the religious affiliation of each person in the group of employees hired or managed by Rich.

Moreover, nothing else of record intimates Robert knew of plaintiff's religion. It was not a policy at the dealership to consider an employee's religion or ethnic heritage in any employment decision. The record does not reflect that anything in the application or interview process sought to ascertain a prospective employee's religion. The religion may, however, have been disclosed by the applicant voluntarily either orally or through items of apparel or jewelry worn by the applicant. In this manner, Robert became aware of Rich's religious affiliation.

5. Rich also hired the individual that was the new car sales manager during the three-month period when Rich was the general manager at the dealership.

6. The appraisal of the trade-in vehicle is an effort to ascertain the "actual cash value ("ACV") or wholesale value of the trade-in vehicle. The ACV is based on the year, make and model of the vehicle; its mileage; the type of equipment and accessories the vehicle has; and the actual condition of the vehicle. In ascertaining the ACV, the appraiser considers guidebooks, the appraiser's own experience, and information gained through consultations with staff at dealerships selling the particular make of the vehicle.

New car salespersons are paid by commission, rather than by salary. The commission is affected by the value given for a customer's trade-in vehicle. If the salesperson gives the customer the ACV as the value for the trade-in vehicle, then the salesperson gets the commission provided by the formula used at the dealership. If the salesperson gives the customer a trade-in value greater than the ACV for the trade-in vehicle, the amount above the ACV is deducted from the profit on which the salesperson's commission is based. If the salesperson gives the customer a trade-in value less than the ACV for the trade-in vehicle, the salesperson's commission is based on the usual profit plus the difference between the ACV and the amount actually given to the customer as trade-in.

If the trade-in value is too low, then the customer may complete the sales transaction at a different dealership. The higher the trade-in value, the greater the likelihood the sales transaction will be completed,[7] because the customer pays less cash toward the sale price of the new vehicle. A higher trade-in value may, however, adversely affect the financial status of the used car department of the dealership. If the trade-in value is too high, that department may suffer a loss if the trade-in vehicle is not sold at retail and must be sold at wholesale for an amount less that the trade-in value given for the vehicle.

Therefore, it is not unusual for a new car sales manager or a new car salesperson to discuss an appraisal of a trade-in vehicle with the manager providing the appraisal. The new car sales department will attempt to obtain a high trade-in value and therefore a high appraisal, whereas the used car sales department will endeavor to keep the trade-in value at the ACV level. During these discussions the new car salesperson may endeavor to increase the appraisal by reporting on information about the customer's car that is not readily available to the appraiser through the usual means of ascertaining the ACV. For instance, the new car salesperson may learn of and relay information that the vehicle was kept in a garage rather than outside or that the vehicle was used by only one owner.

In February, 1989, Robert Chitwood became the used car sales manager at Bob Downes.[8] Prior to this position he had been the new car sales manager at another St. Louis area car dealership. Chitwood was discharged by Robert in August, 1989, and is now working for another St. Louis area car dealership.

In addressing appraisals of trade-in vehicles, Chitwood consistently experienced difficulties with plaintiff and another salesperson, Ken McArthy.[9] On several occasions, these salespersons sought trade-in vehicle appraisals from Rich instead of from Chitwood. When this resulted in an appraisal of a trade-in vehicle in an amount greater than the appraisal amount given by Chitwood for the same vehicle, this caused problems for Chitwood. Bypassing Chitwood for higher appraisals undermined Chitwood's authority, and the increased appraisals could adversely affect the bottom line for the used car sales department. On several occasions Chitwood discussed with Robert the appraisal disputes he had with plaintiff and Rich.

On the morning of April 26, 1989, Chitwood reported to Robert that two of his appraisals on April 25, 1989, had been increased by Rich. One involved a trade-in

7. The possibility that a sales transaction will occur may also be enhanced by reducing the "list price" set by the dealership for the new vehicle. The list price usually consists of the sum of the cost of the car to the dealership, plus a "pack" which is an amount added to cover miscellaneous costs incurred by the dealership to maintain and sell the vehicle. At Bob Downes, the new car sales department had the authority to alter the list price of a new car for purposes of effectuating a new car sales transaction.

8. Casey Jones and Bob Tiemann had been used car managers prior to Bob Chitwood.

9. In addition to the fact McArthy and plaintiff regularly disagreed with Chitwood's appraisals, plaintiff disagreed with Chitwood's appraisals in an unprofessional manner. The discussions with plaintiff were confrontational and usually involved plaintiff raising his voice and getting animated. Robert overheard several of these discussions. On at least two occasions plaintiff threw things in Chitwood's direction during the course of discussions regarding a trade-in vehicle's appraisal. Chitwood did not have similar experiences with other salespersons at Bob Downes.

vehicle on a sale completed by plaintiff and resulted in an appraisal $500.00 greater than the amount given by Chitwood.[10] Robert responded that no one had been authorized to change Chitwood's appraisals and that he would have a meeting with the sales staff to clarify Chitwood's responsibility for used car appraisals. Additionally, plaintiff's commission on that sale was reduced to reflect the lower appraisal provided by Chitwood.

During the sales staff meeting later that day, Robert reiterated his policy that no one had authority to change Chitwood's appraisals. Plaintiff was angered by the possibility a sales commission could be altered after completion of the sale. During the meeting plaintiff stood up to voice an objection, pointed his finger in Robert's direction, and loudly made statements to the effect that the policy

was "illegal" and "cheated" salespersons.[11] While other salespersons may have responded to Robert's statements during the meeting, none responded in the manner in which plaintiff responded.

Robert described his reaction to plaintiff's conduct during the meeting as "the straw that broke the camel's back" and "the crowning blow." Robert considered Chitwood's "very extensive" complaints about plaintiff; the occasion when plaintiff said "this fuckin' place" in the showroom while two customers were in the open finance office which was adjacent to the showroom;[12] the unkempt appearance of plaintiff's demonstrator vehicle;[13] Robert's observations of a racing form in front of plaintiff while he was on the telephone at the dealership,[14] and plaintiff's

10. Plaintiff and Rich each testified that Chitwood had not seen the vehicle before Rich provided the appraisal. Chitwood testified that he had seen and appraised the vehicle, and then had left the dealership. When he returned later that day after the sale was completed, he was advised of the appraisal provided by Rich for the vehicle. The Court finds Chitwood's testimony more credible. Rich and plaintiff, each of whom were discharged by defendant and are suing defendant regarding those discharges, have a stronger bias against defendant than Chitwood, who was discharged by defendant but is not seeking relief from defendant as a result of that discharge. While all three concur Chitwood was not present when Rich provided his appraisal and the transaction was completed, the Court is persuaded Chitwood would have more interest in a change in an appraisal he provided than in the fact an appraisal was completed during his absence from the dealership. Chitwood did not question the propriety of having another authorized person at the dealership provide appraisals when he was absent, otherwise sales transactions involving trade-in vehicles could only be completed when he was present. Instead, Chitwood was concerned about changes in his appraisals that resulted from changes made by others without consulting him.

11. Plaintiff and all other witnesses acknowledged that, as owner of the dealership, Robert could make any policy he desired. It was the salespersons' perception, however, that the policy announced during the April 26, 1989, staff meeting was a change in previous policy and unfairly impacted on the new car salesperson's pay provisions.

12. In response to that statement Robert told plaintiff not to talk like that. Other witnesses testified numerous persons cursed in the showroom area, but no witness persuasively contra-

dicted Robert's testimony regarding this experience with plaintiff, persuasively stated that Robert was present during other cursing in front of customers and failed to do anything about it, or persuasively stated that any cursing similar to the statement made by plaintiff occurred in the presence of customers. Accordingly, the Court does not find that Robert's reaction to plaintiff's cursing in front of customers implicated discrimination or was unwarranted in light of the situation in the showroom at the dealership.

13. In March, 1989, Robert saw the interior of plaintiff's demonstrator and described it as "trashed" with dog hairs and soda cans. Robert's perception of plaintiff's demonstrator vehicle was not disputed. Other employees, including Kathy, had noticed the "filthy" condition of plaintiff's demonstrator. Plaintiff explained the manner in which he kept his demonstrator vehicle did not adversely affect the subsequent sale of the vehicle and therefore was improperly used as a basis for his discharge. While the cleanliness of the demonstrator vehicle may not have adversely impacted the sale of the vehicle, the Court finds it not discriminatory or improper for Robert to consider plaintiff's maintenance of the demonstrator vehicle in ascertaining whether or not to retain plaintiff. Such vehicles were regularly provided by a dealership to its salespersons as advertising for the dealership and so that the salespersons did not drive vehicles other than the type sold at the dealership.

14. Robert told plaintiff to "get th[e form] out of sight now." Plaintiff points out that Robert was not certain whether plaintiff was actually talking to a bookie and placing a bet on the occasion when Robert saw plaintiff on the telephone with a racing form in front of him. Robert's failure to know definitely whether plaintiff was placing a bet at that time does not lessen the importance to

conduct during the meeting. Then, without consulting any other personnel, Robert decided to discharge plaintiff. Robert called plaintiff into his office, noted he was not satisfied with plaintiff's performance and behavior, and terminated plaintiff's position as salesperson at the dealership. Plaintiff left shortly thereafter and has had sales positions at other Missouri car dealerships since his discharge.

There is no evidence that Kathy attended the relevant sales meeting or discussed with Robert the employment status of plaintiff at any time prior to plaintiff's discharge.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. § 2000e–5(f)(3). Venue here is proper based upon 28 U.S.C. §§ 1391(b) and 1391(c).

Defendant is an employer for purposes of Title VII. 42 U.S.C. § 2000e(b). Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 13, 1989. 42 U.S.C. § 2000e–5(e). On May 21, 1990, the EEOC issued plaintiff a notice of right to sue and this lawsuit was timely filed thereafter.[15] 42 U.S.C. § 2000e–5(f)(1).

■ Plaintiff claims defendant subjected him to disparate treatment based on his religion in violation of Title VII.[16] In this type of case, plaintiff must show he was treated less favorably than others because of his religious beliefs. *Mann v. Frank,* 7 F.3d 1365, 1370 (8th Cir.1993).

■ This Court must first ascertain whether this is a "pretext" case or a "mixed-motives" case of employment discrimination. *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993) (age discrimination case under the Age Discrimination in Employment Act ("ADEA")); *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 996 F.2d 200, 202 (8th Cir.1993) (per curiam) (sex and race discrimination case under Title VII). In the "pretext" case, the premise is that *either* a legitimate *or* an illegitimate set of considerations led to the challenged decision. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 247, 109 S.Ct. 1775, 1788–89, 104 L.Ed.2d 268 (1989); *Radabaugh,* 997 F.2d at 448. In such cases the employee carries the burden of persuading the factfinder the employee has been a victim of intentional discrimination. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Plaintiff must initially prove a prima facie case of discrimination; then the employer has the opportunity to articulate a legitimate reason for the action taken; and then plaintiff has the burden of proving the proffered reason is pretextual.

Robert of plaintiff's apparent gambling activities at the dealership and the effect of that knowledge on the decision whether or not to retain plaintiff as an employee. Plaintiff acknowledged he used dealership telephones to place wagers with bookies and that such activities were not lawful, particularly while he remained subject to supervision for a 1983 felony conviction. Plaintiff contended, however, that he only placed such bets during his off-duty time at the dealership. The fact that an employee engaged in gambling activities was not significant to Robert. What was important was the conduct of gambling activities at the dealership and the appearance of such activities while there.

During the period relevant to this lawsuit, Robert was unaware that other employees engaged in gambling activities at the dealership. Witnesses testified to gambling activity by McArthy and by Ray Stine, another salesperson; and to discussions of such gambling at the dealership. The testimony establishes that those and other salespersons may have been interested in learning sports scores, conversing about trips to Las Vegas or other locations where bets could be placed, and obtaining money to address the results of their gambling activities. Additionally, on at least two occasions, Robert and Kathy covered gambling debts of two employees who had incurred the debts outside the dealership. Nothing in the record, however, credibly establishes gambling by other employees actually occurred at the dealership to such an extent that Robert should have known about any such activities. Furthermore, there is no indication of record that anyone reported such activity to Robert.

Under the circumstances, the Court does not infer discriminatory conduct by Robert in considering apparent gambling activity by plaintiff, but not of other employees.

**15.** This lawsuit was originally filed in the Circuit Court of St. Louis County and was removed to this Court on February 7, 1990.

**16.** Prior to amendment by the Civil Rights Act of 1991, Title VII prohibited an employer from discharging any individual because of the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1).

*Radabaugh,* 997 F.2d at 448, citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981).

In a "mixed-motives" case, the employment decision is a mixture of legitimate and illegitimate motives. *Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1788–89; *Radabaugh,* 997 F.2d at 448. In such a case plaintiff has the initial burden of proving an illegitimate factor was a motivating factor in an adverse employment decision; then the employer has the burden to prove it would have made the same decision even in the absence of the illegitimate factor. *Radabaugh,* 997 F.2d at 448; *Stacks,* 996 F.2d at 202. Unlike the "pretext" case, the burden of persuasion shifts to defendant in a "mixed motives" case. *Sargent v. Paul,* 16 F.3d 946, 948 n. 5 (8th Cir.1994) (No. 93–1369); *Stacks,* 996 F.2d at 202; *but see Johnson v. Arkansas State Police,* 10 F.3d 547, 551 (8th Cir. 1993) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94, and stating that under the mixed-motives analysis the burden of persuasion remains at all times with plaintiff). If plaintiff does not satisfy the requirements of a "mixed-motives" case, then the case must be decided under the "pretext" case analysis. *Sargent,* 16 F.3d at 948–49; *Radabaugh,* 997 F.2d at 448; *Beshears v. Asbill,* 930 F.2d 1348, 1353 (8th Cir.1991).

A "mixed-motives" case exists where plaintiff presents evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude such that the factfinder may infer the attitude was more likely than not a motivating factor in the employer's decision. *Radabaugh,* 997 F.2d at 449, quoting *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992); *Beshears,* 930 F.2d at 1354. Stray remarks at the workplace, statements by those not involved in the decision-making process, and statements by decisionmakers unrelated to the decisional process are insufficient to establish a mixed-motives case, whereas comments and conduct of the employer demonstrating a discriminatory animus, such as remarks demonstrating a discriminatory animus in the decisional process or remarks by individuals closely involved in employment decisions, support a determination that the case is a "mixed-motives" case. *Beshears,* 930 F.2d at 1354.

Here, plaintiff has not presented sufficient evidence to permit the Court to conclude that a discriminatory animus based on plaintiff's religion was a motivating factor in the decisionmaking process that led to plaintiff's discharge. Robert was the sole decisionmaker regarding plaintiff's discharge, particularly in view of the earlier discharge of Rich, who was the manager in charge of plaintiff's department. The evidence indicates that numerous persons at the dealership may have made remarks or statements pertaining to plaintiff's religion, but none of those remarks or statements may be attributed to Robert[17] and none of those remarks or statements were made by decisionmakers involved in the decision to discharge plaintiff. Furthermore, there is no documentary evidence to indicate either that Robert considered plaintiff's religion in coming to the decision to discharge plaintiff or that there was a policy at the dealership to consider an employee's religion, much less plaintiff's religion, in rendering employment decisions.

To the extent the Court should consider Rich as having an influence on Robert's decision whether to keep or discharge plaintiff, there is no indication that Rich's perception of plaintiff's religion impacted adversely on such a decision. It was important to Rich that others be aware of his religion because derogatory remarks regarding the Jewish faith and those who followed it upset him. Rich had known plaintiff numerous years, knew plaintiff was Jewish, had worked with plaintiff in other dealerships, and thought

---

**17.** Comensky testified by deposition that he recalled overhearing Robert say "those damn Jews" in a conversation with Kathy. Comensky had no idea what the focus of the conversation was. The Court is not persuaded that such a remark was made by Robert. Robert credibly testified that he did not make such remarks; and other employees testified they did not recall Robert making such statements.

plaintiff was one of the best car salespersons in the St. Louis area. Nothing in the record indicates either that Rich would perceive a person of the Jewish faith malevolently or that Rich thought plaintiff should be discharged because of plaintiff's religion or for any other reason. Thus, any remarks or statements made by Rich do not support a determination that plaintiff's discharge presents a "mixed-motives" case.

■■■ Moreover, any remarks made by Kathy regarding the Jewish faith or people who follow that religion may not be attributed to Robert for purposes of ascertaining whether or not this is a "mixed-motives" case. Kathy was not involved in the decision to discharge plaintiff or in any personnel decision regarding the new car sales department at the dealership. The fact Kathy shared an office with Robert, was married to Robert, or discussed with Robert matters pertaining to the administrative department at the dealership does not support a determination that Kathy was intimately involved in the decision to discharge plaintiff or in the decisionmaking process leading to plaintiff's discharge. The evidence clearly discloses that Kathy did not have a significant influence on either the decisionmaking process leading to plaintiff's discharge or the ultimate decision to discharge plaintiff. Thus, any remarks she may have made to Robert regarding Judaism or any new car sales persons who followed that religion may be deemed at most stray remarks or remarks by a decisionmaker not related to the decisional process.

Under the circumstances, there is no inference that plaintiff's religion was a motivating factor in plaintiff's discharge and this case is not a "mixed-motives" case. Accordingly, the case will be analyzed under the principles applicable to a "pretext" case.

■■■ In a disparate treatment case subject to pretext analysis, plaintiff must first establish by a preponderance of the evidence a prima facie case of employment discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. To do so, plaintiff must "show[ ] actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion [that is] illegal'" under the statute. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *Williams v. Ford Motor Co.,* 14 F.3d 1305, 1308 (8th Cir.1994); *Favors v. Fisher,* 13 F.3d 1235, 1237 (8th Cir.1994). While the burden is not onerous, *Arkansas State Police,* 10 F.3d at 551, plaintiff must show he is a member of a protected class; he is capable of performing the job satisfactorily; and he was discharged. *Hayes v. Invesco, Inc.,* 907 F.2d 853, 855 (8th Cir.1990) (action under Title VII and 42 U.S.C. § 1981 claiming race discrimination in discharge). Plaintiff does not need to establish that the employer sought an employee outside of the protected group to fill plaintiff's position after the discharge. *Ford Motor Co.,* 14 F.3d at 1308; *see Walker v. St. Anthony's Medical Ctr.,* 881 F.2d 554, 558 (8th Cir.1989) (noting a prima facie of sex discrimination in discharge may be established even when a female plaintiff demonstrates she was replaced by another female).

There is no dispute that plaintiff is a member of a protected class, those who follow Judaism;[18] and plaintiff was discharged. Rather, it is the second element of the prima facie case that is at issue.

■■■ In ascertaining whether or not someone is qualified for a position from which the person is discharged, the Court considers whether the plaintiff was satisfactorily performing the job. *Hayes,* 907 F.2d at 855 (Title VII and § 1981 action); *Crimm v. Missouri Pacific R.R. Co.,* 750 F.2d 703, 711 (8th Cir.1984) (discharge case under the Age Discrimination in Employment Act

---

**18.** While defendant made much of the fact plaintiff did not actively practice his religious faith during the period when he was employed at Bob Downes, there is nothing of record to permit this Court to determine plaintiff did not follow the Jewish faith. Importantly, this case does not raise issues regarding an employer's alleged interference with an employee's practice of a religious faith. Additionally, defendant has not contended that those who do not actively follow Judaism are outside a class protected by Title VII.

("ADEA")); *see Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285, 290 (8th Cir.1982) (for a discharge claim under the ADEA, part of plaintiff's prima facie case includes a showing the employee was "qualified for the job in the sense that performance met [the employer's] legitimate expectations"), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983). Where an employee is not reprimanded or given an indication that there were problems with the employee's job performance, then plaintiff has established a prima facie case despite evidence of problems with plaintiff's job performance. *Arkansas State Police,* 10 F.3d at 551–52.

■ Plaintiff was qualified for his position as a new car salesperson. Plaintiff had had sales positions at various car dealerships prior to working for defendant; and during his tenure at Bob Downes plaintiff was one of the top car salespersons. Moreover, while Robert let plaintiff know when Robert disapproved of plaintiff's conduct, it is not clear that plaintiff was advised such conduct affected defendant's perception of plaintiff's job performance. Therefore, plaintiff has established he was qualified for the position from which he was discharged and has satisfied the requirements for a prima facie case.

■ The Court must next address whether or not defendant has articulated any legitimate, nondiscriminatory reason for the discharge. It is not this Court's job "to determine whether the [termination] decision ... was sound," *Saunders v. Southland Corp.,* 779 F.Supp. 1009, 1015 (E.D.Mo.1991), "the relevant question is simply whether the given reason was pretext for illegal discrimination," *Clay v. Hyatt Regency Hotel,* 724 F.2d 721, 725 (8th Cir.1984); *accord, Crimm,* 750 F.2d at 712 (noting the issue is not whether the employer was correct in its determination that the discharged employee was engaging in the relevant conduct, "but only with whether this was the real reason for the termination"). Lack of cooperation or a failure to meet standardized performance requirements may support a discharge decision. *Richmond v. Board of Regents,* 957 F.2d 595, 598 (8th Cir.1992) (in a case pursued under Title VII and § 1981, unsatisfactory work performance constitutes a proper reason for an employee's discharge); *Miner v. Bi–State Dev. Agency,* 943 F.2d 912, 914 (8th Cir.1991) (in a case under Title VII and 42 U.S.C. § 1981, insubordination constitutes a nondiscriminatory reason for an employee's termination); *Charles v. Allstate Ins. Co.,* 932 F.2d 1265, 1269 (8th Cir.1991) (noting an employer rebutted plaintiff's prima facie case by showing in part the relationship between plaintiff, defendant employer and defendant manager "became defensive and adversarial because of [plaintiff's] attitude."); *Johnson v. Yellow Freight Sys., Inc.,* 734 F.2d 1304, 1307–08 (8th Cir.) (finding, in a case pursued under Title VII and § 1981, that the employer had rebutted plaintiff's prima facie case by establishing plaintiff's poor work performance, which constitutes a proper reason for an employee's discharge), *cert. denied,* 469 U.S. 1041, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984); *McLean v. Satellite Technology Servs., Inc.,* 673 F.Supp. 1458, 1460–61 (E.D.Mo.1987); *Windom v. City of St. Louis,* 427 F.Supp. 806, 813, 814 (E.D.Mo.) (inability to accept supervisor's directions supported discharge), *aff'd,* 568 F.2d 78 (8th Cir.1977) (per curiam).

■ Here, defendant has articulated legitimate, non-discriminatory reasons for plaintiff's discharge. The discharge was based on plaintiff's unsatisfactory conduct, including failure properly to care for the demonstrator car provided by defendant, frequent arguments with management over automobile appraisals, use of profanity on the showroom floor, devoting work time to personal matters rather than to business of the dealership, and plaintiff's improper conduct toward Robert during the April 26, 1989, staff meeting. Nothing of record persuasively indicates that plaintiff did not engage in the conduct that was the basis of Robert's discharge decision. Accordingly, this Court must ascertain whether the discharge was pretextual.

■ Plaintiff may establish a pretextual decision by demonstrating the employer treated non-Jewish employees differently than Jewish employees. *Mann,* 7 F.3d at 1370. This requires that plaintiff show a similarity between his conduct and that of

non-Jewish employees who were not discharged for similar conduct. *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 603 (8th Cir.1983), *cert. denied*, 469 U.S. 847, 105 S.Ct. 160, 83 L.Ed.2d 97 (1984); *Boner v. Board of Comm'rs*, 674 F.2d 693, 696–97 (8th Cir. 1982); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1255–56 (8th Cir.1981). Thus, in addressing this aspect of the case, the Court considers whether plaintiff and the other employees were " 'similarly situated in all relevant respects.' " *Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 723 (8th Cir.1985) (quoting *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986); *accord Jones v. Frank*, 973 F.2d 673, 675–76 (8th Cir.1992) (it is improper to compare the conduct of female plaintiff with the conduct of three males who were at different employment facility under a different supervisor and had a different procedural status with respect to their EEOC charges).

 Plaintiff urges he is entitled to judgment based on the fact that all employees following the Jewish faith were fired on the same day and non-Jewish employees were not discharged for gambling, cursing or disputing appraisals.[19] This Court concludes that plaintiff's discharge was not discriminatory.

While it is true that those employees who followed the Jewish religion were all discharged on the same day as plaintiff, there is no intimation that those employees' Jewish faith had any impact on the discharge decisions. It is undisputed that Comensky had consistently been one of the salespersons with a low sales record. Even Rich acknowledged he would have discharged Comensky if his sales record did not improve within a short period of time. Robert had had personal experiences with Rich just prior to Rich's discharge that led Robert to question the propriety of retaining Rich as new car sales manager. Robert perceived Rich as disloyal and Rich had been part of the ongo-

ing appraisal problem with Chitwood. Additionally, the fact that three individuals were discharged on one day is not alarming. Frequent turnover of car dealership personnel is not unusual so the Court is unable to discern any discrimination in the fact that three members of the new car sales department were discharged on the same day.

Moreover, plaintiff has not satisfied the requirement that non-Jewish employees who were not discharged be similarly situated to plaintiff. There is no indication that Robert was aware of gambling at the dealership or cursing in front of customers by other salespersons at the dealership. Nor is there any indication that other salespersons maintained their demonstrator vehicles in the same condition as plaintiff's demonstrator vehicle. Finally, plaintiff has not established that any salesperson behaved in the same manner as plaintiff acted when disagreeing about either appraisals of trade-in vehicles or Robert's statements during the April 26, 1989, staff meeting. Absent such similarities, the Court is unable to discern that plaintiff and any other salesperson were "similarly situated in all relevant respects.

Under the circumstances, the Court finds defendant did not discriminate against plaintiff on the basis of plaintiff's religion when defendant discharged plaintiff as a salesperson at Bob Downes on April 26, 1989. In light of this ruling, the Court will not further address any award of backpay, interest, attorney's fees, or costs.

An appropriate judgment shall accompany this memorandum.

---

**19.** Plaintiff also contends he is entitled to judgment as a matter of law "once Plaintiff proves that all of Defendant['s] alleged reasons for the adverse employment action are incorrect." The Court disagrees. Even assuming arguendo that defendant's reasons for plaintiff's discharge were incorrect, such a finding does not require entry of judgment in favor of plaintiff. *St. Mary's Honor Center*, — U.S. at —, 113 S.Ct. at 2749 (noting appellate court was incorrect in deciding that rejection of an employer's reasons *compels* judgment for plaintiff).